**In re BEYOND.COM CORPORATION, a Delaware corporation, Debtor.**

No. 02–50441–MM.

United States Bankruptcy Court, N.D. California.

Jan. 31, 2003.

Jeffry Davis, Lillian Stenfeldt, Gray, Cary, Ware & Freidenrich, Palo Alto, CA, for Debtor in Possession.

Richard Rogan, Nicholas DeLancie, Jeffer, Mangels, Butler & Marmaro, San Francisco, CA, for Creditors' Committee.

Kevin Epstein, Office of the United States Trustee, San Jose, CA, for the United States Trustee.

## OPINION

MARILYN MORGAN, Bankruptcy Judge.

### *INTRODUCTION*

Before the court is the debtor's disclosure statement dated November 21, 2002. Because the underlying plan is patently unconfirmable, the disclosure statement may not be approved. *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D.Pa.2001); *In re United States Brass Corp.*, 194 B.R. 420, 422 (Bankr.E.D.Tex. 1996); *In re Eastern Maine Electric Cooperative, Inc.*, 125 B.R. 329, 333 (Bankr. D.Me.1991); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr.S.D.N.Y.1990).

The offensive plan provisions are not unique to this liquidating chapter 11 case and are not the brainchild of counsel for the debtor, but were copied from some other plan, apparently confirmed in some other jurisdiction and circulated as a model of creativity.

### *BACKGROUND*

During the height of the dot-com boomlet, Beyond.com's stock was publicly traded, raising $185 million from its initial and secondary offerings and $63 million from convertible notes. As of December 31, 2001, Beyond.com showed a net operating loss carry forward of $316,578,000. Beyond.com filed the bankruptcy case on January 24, 2002, after it had ceased operations.

The United States Trustee appointed an official unsecured creditor's committee, consisting of five creditors, on February 6, 2002. Although not identified in the debtor's disclosure statement, the members of the official unsecured creditor's committee, their individual representatives, and the amounts of their claims are as follows: (1) LaSalle Bank, N.A., Russell C. Bergman, Esq., $15,274,000; (2) Microsoft Corporation, Kathryn A. Mihalich, $20,595,308; (3) Stellent Chicago, Inc., Louis Gomez, $100,000; (4) Sento Corporation, Stanley J. Cutler, $107,349.49; and (5) Right Now Technologies, Jan Weikert, $200,000.

The debtor sold its on-line retail software operations in two unrelated sales. The eStore business sale to Digital River closed on March 31, 2002, and the Government Systems business sale to Softchoice closed on July 31, 2002. The disclosure statement reveals assets approximating $9,268,397, a significant portion of which consists of shares of publicly traded stock, and it estimates liabilities at $47,636,000. From the outset, a liquidating plan was the goal of the parties as the quickest method to distribute funds to creditors.

Beyond.com originally filed its plan on August 9, 2002. The plan is unusual in that it envisions that the reorganized debtor would "retain all of the rights, powers, and duties of a trustee under the Bankruptcy Code." The debtor's former Chief

Operating Officer, John Barratt, would serve as a Liquidation Manager in accordance with a Liquidation Manager Agreement not a part of the court's record. Barratt's work would be supervised by the committee pursuant to Committee By-Laws, also not a part of the court's record. Among other things, the plan authorizes Barratt to "hold, sell, enter into derivative contracts for hedging, or otherwise dispose of the stock" upon majority approval of a sub-committee consisting of Barratt and two members of the committee, which is deemed approved twenty-four hours after written notice to the sub-committee. Post-confirmation, Barratt is authorized to retain and pay advisors regarding the stock, without supervision or limitation. Otherwise, he is authorized to abandon or sell assets valued at less than $50,000 only on notice to or with the consent of the committee.

As to the employment of professionals, the disclosure statement, in a sentence certain to confound, provides:

> From time to time after the Effective Date, the Reorganized Debtor and/or the Committee may employ, engage the services of and compensate Persons and Professional Persons (which may include agents or independent contractors or Professional Persons previously or concurrently employed by the Committee or previously employed by the Debtor including, without limitation, Committee Counsel, Debtor's Counsel, Debtor's special counsel, Committee Accountants and Debtor's Accountants), reasonably necessary to assist the Liquidation Manager in performing his duties under this Plan, without the necessity of further authorizations by the Bankruptcy Court, *provided* that the Liquidation Manager shall not hire a Professional Person except upon either (1) consent of the Committee or (2) Bankruptcy Court authorization granted upon no less than ten (10)

days notice to the Committee and Debtors' Counsel; *provided, further,* after the Confirmation Date, the Reorganized Debtor and/or the Committee may retain Debtor's accountants, Debtor's Counsel, Debtor's brokers or agents, Committee Counsel, Committee's accountants and Committee's financial advisor, as professionals without further action by the Committee or order of the Bankruptcy Court.

Additionally, Barratt, may either act as the disbursing agent or engage one.

As to litigation claims, the disclosure statement provides that all of the estate's claims and causes of action as set forth in Exhibit "A" (litigation listed in the Statement of Affairs) and Exhibit "C" attached to the disclosure statement *may* be asserted by the Liquidation Manager and the Committee, but that the debtor has not had an adequate opportunity to complete its review of these claims and will not have identified all potential defendants by the time of plan confirmation. Exhibit "C" entitled "Retained Claims and Defenses" is a five page document. The preface to the exhibit explains that "[t]he inclusion of a particular claim, including but not limited to claims against insiders and or (sic) officers of the Debtor, does not indicate an endorsement or opinion on the validity or merits of a particular claim." Sub-paragraphs (a) through (p) are generally generic in substance, except that Barratt is identified by name twice and implicated in a third paragraph. Of particular concern are the following paragraphs:

> The term "Retained Claims and Defenses" is broadly defined in the Plan to mean:

> All claims ... (including but not limited to those arising under Bankruptcy Code sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, and 553), which ... arise

out of, or are related to any of the following:

(a) All claims, causes of action and defenses against the current and/or past officers and/or directors of the Debtor, including but not limited to ... John Barratt ... including claims, causes of action and defenses arising out of or related to breach of duty, negligence, mismanagement and/or excessive compensation together with all claims, recoveries, and proceeds of and rights in and under any insurance policies therefore, including but not limited to the Directors and Officers Liabilities Insurance policies . . . .

\* \* \* \* \* \*

(c) All claims causes of action, defenses, rights of offset or recoupment, fraudulent transfer claims, avoidance and recovery of preferential transfers and other bankruptcy avoidance actions, and all rights and remedies including contractual subordination or equitable subordination of claims, against or with respect to current and/or past officers and/or directors of the Debtor, including but not limited to ... John Barratt ... with respect to the Executive Trust.

\* \* \* \* \* \*

(j) All claims and causes of action, including bankruptcy avoidance powers, against any present or former officer or employee of the Debtor on account of payments of salary, severance pay, termination pay, employee benefits, or other compensation which Debtor paid or became obligated to pay within four (4) years prior to the Petition Date.

Elsewhere in the disclosure statement the Executive Trust referenced above is explained. Prior to the creation of the Executive Trust, Beyond.com had contracted to pay as severance one year's salary and bonus totaling $2,300,000 for its five executives, including Barratt. According to the disclosure statement, the Executive Trust was created in November, 2001, six weeks before filing, to provide a mechanism to fund that obligation and to revise executive incentives. It is perhaps noteworthy that the board of directors received advice from current counsel for the debtor regarding its duties to "various stakeholders" and that the five executives were represented by independent counsel. Merrill, Lynch Trust Co. F.S.B., as trustee, distributed half of the severance obligations as a result of certain triggering events, specifically, the filing of the bankruptcy petition, non-payment of regular executive compensation, cessation of business and termination of employment. The remaining half of the Executive Trust was funded in January, 2002, when the board of directors authorized a contract to sell the operating businesses on favorable terms, but before the filing of the bankruptcy case. These funds were to be distributed one half upon consummation of a sale in excess of $5 million for the eStore business and the remainder upon consummation of a sale in excess of $5 million for the Government Systems business. However, after the filing of the case, the favorable contract failed and the sales targets were not met, resulting in the return by Merrill, Lynch of $1,150,000 to the estate.

The plan also provides that either Barratt or the committee, on ten days' notice to the other and to a "Post–Effective date Limited Notice List" could modify or amend the plan or request "instructions" from the court with respect to "authority to undertake certain actions or to refrain from taking actions under this Plan." For these services, Barratt would be paid at an hourly rate of $225, a minimum monthly payment of $10,000, for an "initial term" of nine months.

As to the disclosure statement's liquidation analysis, the sole asserted difference between the costs of liquidating in chapter 11 versus chapter 7 is the assumption that a chapter 7 trustee would receive the statutory maximum fee of $301,601, while Barratt's "initial 9 month budget" proposes to cost a mere $255,000. Postconfirmation legal fees are estimated at $100,000 in the chapter 11 analysis but are estimated at $150,000 in the chapter 7 analysis.

At the insistence of the United States Trustee, a provision titled "Channeling of Claims," which purported to preclude postconfirmation date claims against the estate, the reorganized debtor and the liquidation manager, was deleted from the final version of the plan and disclosure statement filed with the court. However, other provisions remain that attempt to limit the personal liability of Barratt and the committee for acts performed in their official capacities.

### DISCUSSION

Conceptually, Beyond.com's plan and disclosure statement is as freewheeling with the Bankruptcy Code and Rules as Enron's accountants were with the tax laws in the 1990s. There are many reasons why the disclosure statement before the court should not be approved. However, this decision focuses on the requirements of 11 U.S.C. § 1129(a), specifically § 1129(a)(1), requiring compliance with the applicable provisions of Title 11, § 1129(a)(4), requiring that payments for services in connection with the case be approved by the court as reasonable, § 1129(a)(5) requiring disclosure of the identity and affiliations of individuals proposed to serve as directors, officers or voting trustees of the debtor and that the appointment or continuance in such office be consistent with the interests of creditors and with public policy, and § 1129(a)(11), requiring that confirmation of the plan not likely be followed by the need for further financial reorganization.

### 1. Compliance with Applicable Provisions of Title 11.

■ Section 1129(a)(1) provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

This section provides that the bankruptcy court has the power to confirm a plan only if it complies with applicable provisions of the Bankruptcy Code. *See In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir.1995), *cert. denied*, 517 U.S. 1243, 116 S.Ct. 2497, 135 L.Ed.2d 189 (1996); *In re Commercial Western Finance Corp.*, 761 F.2d 1329, 1338 (9th Cir.1985).

■ Beyond.com's proposed plan contains numerous provisions that modify the requirements of the Bankruptcy Code. Of greatest concern to the court are those provisions that dramatically reduce notice to creditors of matters that the drafters of the Bankruptcy Code and Rules considered fundamental to bankruptcy due process. Notice, after all, is the cornerstone underpinning bankruptcy procedure. *In re Savage Industries, Inc.*, 43 F.3d 714, 720 (1st Cir.1994); *In re Hexcel Corp.*, 239 B.R. 564, 567 (N.D.Cal.1999). For example, the plan grants the Liquidation Manager the authority under the plan to dispose of property and to engage in agreements without court order or compliance with § 554 and Bankruptcy Rule 6007 regarding the abandonment of property of the estate, §§ 327 and 330 and Bankruptcy Rules 2002, 2014, and 2016 regarding the retention and compensation of professionals, § 1127 regarding modification of the confirmed plan, § 363 and

Bankruptcy Rules 2002 and 6004 regarding the sale of property of the estate, and Bankruptcy Rules 2002 and 9019 regarding compromises or settlements of controversies. The modifications to the applicable provisions of title 11 are not minor, ministerial or simply pragmatic. In effect, the plan affords the reorganized debtor the prerogative to comply selectively with the provisions of the Bankruptcy Code and Rules without judicial supervision. A more cynical view suggests that providing the least notice to the fewest people reduces oversight. Accordingly, the plan fails to satisfy the requirements of § 1129(a)(1).

## 2. *Approval by the Court of Services in Connection with the Case as Reasonable.*

▇▇ Section 1129(a)(4) provides:

Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

This section mandates full disclosure of all payments for services, costs, and expenses in connection with the case and subjects the reasonableness of these payments to the scrutiny and approval of the court. *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr.S.D.Ohio 1988). It ensures compliance with the policies of the Code that the bankruptcy court should police the awarding of fees in title 11 cases and that holders of claims and interests should have the benefit of information that might affect the claimants' decision to accept or reject the plan. *Id.*

▇▇ The requirements under § 1129(a)(4) are two-fold. First, there

must be disclosure. Second, the court must approve of the reasonableness of payments. 7 *Collier on Bankruptcy* ¶ 1129.03[4]. Here, the debtor's plan can't estimate the cost of services because it is premature. The debtor has not yet announced what litigation it will pursue. At a minimum, however, there appears to be a likelihood of significant litigation over the Digital River sale, the Executive Trust, and possibly the Softchoice sale. As a result, the generalized projection provided to creditors in the liquidation analysis of the disclosure statement may become so understated as to be meaningless. The plan fails to satisfy the requirements of § 1129(a)(4).

## 3. *Disclosure of Identity and Affiliations of Individuals and Governance Consistent with the Interests of Creditors and Public Policy.*

Section 1129(a)(5) provides:

(A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy. . . .

This section contains a blend of disclosure and substantive requirements. 7 *Collier on Bankruptcy* ¶ 1129.03[5](15th ed. rev. 2002).

▇▇ While the disclosure statement identifies Barratt as the initial Liquidation Manager, it fails adequately to disclose his affiliations. In particular, it fails to disclose the terms of the agreement that gov-

erns Barratt's duties. As a former executive of the debtor, Barratt is subject to potential conflicts of interest, particularly with respect to the administration of the Executive Trust. Notably, the Executive Trust was created as a vehicle that allowed Beyond.com executives, presumably including Barratt, to receive 50% of their "golden parachutes," an amount substantially in excess of the less than 20% distribution anticipated to other unsecured creditors of the estate. Barratt and the committee have the responsibility of deciding whether to sue the executives to recover the funds.

Under the plan, the official committee of unsecured creditors is charged with monitoring and supervising the activities of the Liquidation Manager. While the express language of § 1129(a)(5)(A)(i) does not require it, some courts have extended the reach of the section to include individuals such as the committee members in this case. *Id.* at ¶ 1129.03[5][a]. *See, e.g., In re Valley View Shopping Center, L.P.,* 260 B.R. 10, 23 (Bankr.D.Kan.2001); *In re Holley Garden Apartments, Ltd.,* 238 B.R. 488, 493 (Bankr.M.D.Fla.1999). *But see In re Eagle–Picher Industries, Inc.,* 203 B.R. 256, 267 (S.D.Ohio 1996). The disclosure statement fails to disclose the identities or affiliations of the members of the official committee of unsecured creditors. It also fails to disclose the terms of the committee's bylaws, which generally dictate its duties and rules of governance.

 Once disclosed, the court makes a substantive determination under § 1129(a)(5)(A)(ii) whether post-confirmation management serves the interests of creditors and equity security holders and is consistent with public policy. *See In re Sovereign Group, 1984–21 Ltd.,* 88 B.R. 325, 329 (Bankr.D.Colo.1988). Continued service by prior management may be inconsistent with the interests of creditors,

equity security holders, and public policy if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor. *In re Polytherm Industries, Inc.,* 33 B.R. 823, 829 (W.D.Wis.1983). While the court is not prepared to find that the service of Barratt as Liquidation Manager is unfit, or that management by Barratt or the committee is contrary to the interests of parties in this case or against public policy, the disclosures to date are insufficient to enable the court to conclude that the converse is true.

Without adequate disclosures, the court cannot conduct an intelligent analysis of whether the continuance of those parties in their roles is consistent with the interests of creditors and equity security holders and with public policy. Based on the record presently before the court, it appears there are insufficient safeguards with respect to post-confirmation governance of the debtor to ensure that the interests of creditors and equity security holders are protected. For these reasons, the requirements of § 1129(a)(5) have not been satisfied.

**4. *Not Likely to be Followed by the Need for Further Financial Reorganization.***

 Section 1129(a)(11) provides:

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The feasibility requirement requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable. *In re*

*Acequia, Inc.,* 787 F.2d 1352, 1364 (9th Cir.1986); 7 *Collier on Bankruptcy* ¶ 1129.03[11]. The Bankruptcy Code does not allow modification after substantial consummation, which generally occurs soon after the effective date. However, the proposed plan expressly anticipates modification and implements procedures for modification. Plan modification necessarily requires further financial reorganization. *See In re Hoffman,* 52 B.R. 212, 215 (Bankr.D.N.D.1985). For this reason, the requirements of § 1129(a)(11) are not met.

### *CONCLUSION*

This plan is not confirmable chiefly because it alters the Bankruptcy Code in derogation of the notice provisions that provide fundamental protections for creditors and because its thrust is to avoid judicial supervision unless it is convenient to the debtor or its professionals. However, the court has a continuing oversight responsibility in liquidation cases that cannot be selectively invoked. In its exuberance rewriting provisions of the Code, the author of the proposed plan overlooked the requirements of § 1129(a), which provide a framework ensuring the integrity of the system. These defects cannot be cured.

The disclosure statement is also deficient because it utterly fails to make disclosures about management. The lack of disclosure brings into question not only the ability of the debtor to fulfill its fiduciary responsibilities, but the true allegiance of debtor's counsel and, to the extent the creditor's committee negotiated the proposed plan, the committee's competency, and perhaps, its counsel's self-interest.

Beyond.com filed this case because it needed the special provisions available only to bankruptcy debtors. Having sought bankruptcy's protections, it cannot now rewrite the Bankruptcy Code to suit its purposes.