

**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>GPMI, CO.,<br>                 Debtor. | BAP No. AZ-22-1231-CLB<br><br>Bk. No. 2:22-bk-00150-EPB |
| ALBAAD USA, INC.,<br>                 Appellant,<br>v.<br>GPMI, CO.; ENVOY SOLUTIONS, LLC;<br>NFS LEASING, INC.; OFFICIAL<br>UNSECURED CREDITORS<br>COMMITTEE; YDB CAPITAL, LLC;<br>YARRON BENDOR; SERENE<br>INVESTMENT MANAGEMENT, LLC;<br>FSW FUNDING,<br>                 Appellees. | **MEMORANDUM**[*] |

Appeal from the United States Bankruptcy Court
for the District of Arizona
Eddward P. Ballinger Jr., Chief Bankruptcy Judge, Presiding

Before: CORBIT, LAFFERTY, and BRAND, Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

## INTRODUCTION

Appellant and unsecured creditor Albaad USA, Inc. ("Albaad"), appeals the confirmation of debtor and appellee GPMI, Co.'s ("GPMI") chapter 11[1] plan. Because we find no error, we AFFIRM.

## FACTS

### A.   GPMI

GPMI manufactures wet wipe cleaning products and supplies its products to major wholesalers and retailers. Yarron Bendor, founder and CEO of GPMI, opened GPMI in 1989. GPMI was successful for many years.

### B.   The Albaad Contract

In the fall of 2019, Albaad,[2] the third largest global wet wipe manufacturer at the time, contracted with GPMI to have GPMI manufacture wipes for Albaad in the United States (the "Contract"). The Contract was far larger than any manufacturing contract previously entered into by GPMI. Per the terms of the Contract, Albaad committed to ordering $80 million in products the first year and over $100 million in the second year.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] Albaad is an Israeli company and Albaad Massuot Yitzhak Ltd is Albaad's parent company. At the time of the Contract, Albaad was a publicly traded company on the Tel Aviv stock exchange with several locations in Europe and one American subsidiary located in North Carolina.

During negotiations, GPMI informed Albaad that in order to successfully perform under the terms of the Contract and fulfill Albaad's large orders, it would need to expand its manufacturing facilities, add specialized equipment, and increase its workforce. Albaad agreed to advance GPMI $3,750,000.00 for its expansion. In exchange, GPMI promised to repay the funds as credits against Albaad's future orders. Additionally, GPMI spent approximately $7,500,000 of its own capital to "ensure it was ready to meet the Albaad contract."

In late February 2021, GPMI began fulfilling its contractual obligations by shipping products to Albaad. However, Albaad refused to take receipt and pay for much of the product. Albaad's end customer rejected the wipes and terminated its purchase agreement with Albaad after Albaad failed to obtain the necessary EPA and state-level product registrations. Because Albaad had no customer to sell the wipes to, Albaad refused the GPMI product and refused to pay GPMI $800,000 for the wipes already produced. Additionally, Albaad informed GPMI that it would not honor any of its future contractual commitments to GPMI. Repeated attempts to resolve the dispute failed.

GPMI asserted that Albaad's breach caused GPMI to: (i) lose over $37,000,000 in 2021 budgeted revenue; (ii) incur storage expenses for the privately labeled Albaad products;[3] (iii) fall behind on its regular customer

_____

[3] Approximately $17,000 per month for storage.

3

obligations; and (iv) incur ongoing significant fees for equipment leases obtained solely to fulfill the Albaad Contract.

After Albaad failed to perform under the Contract, GPMI was in financial crisis and engaged in extensive efforts to reorganize its business and cut costs. GPMI's cost-cutting measures included laying off more than half the employees, returning leased equipment, terminating the 45,000 square-foot warehouse lease, and reducing administrative expenses. However, the cost savings were not enough to significantly change GPMI's financial condition. Therefore, GPMI decided to hire MCA Financial Group, Ltd. ("MCA")[4] as a financial consultant to assist GPMI with identification of potential financing sources, investors, and/or purchasers.

Starting in the late summer of 2021, MCA solicited offers to purchase equity in GPMI or to purchase GPMI's assets from 32 qualified parties, including at least 20 financial buyers and 12 strategic buyers in related industries. Due diligence materials were provided to 15 prospective purchasers who executed non-disclosure agreements. Ultimately, negotiations progressed to formal letters of intent with two potential buyers.

One of the final potential buyers was Albaad. As part of the due diligence process, Albaad obtained GPMI's confidential financial

---

[4] MCA's founder and primary consultant to GPMI, Morris Aaron, is a nationally recognized expert in the business advisory industry with over thirty years of experience in mergers and acquisitions, business valuation, and restructuring.

information. By late 2021, the parties were engaged in substantive negotiations regarding the terms of a potential full acquisition by Albaad, to the point that the parties were circulating draft term sheets. However, on November 11, 2021, Albaad suddenly halted all negotiations with GPMI, informing GPMI that it would be taking a "$10 million write-off" in its U.S. operations and would no longer be pursuing "M&A activity in the U.S."[5]

## C. Chapter 11 bankruptcy

On January 10, 2022, out of other options, GPMI filed a voluntary chapter 11 petition. GPMI planned to either reorganize by securing capital investment or by selling the business as a going concern. GPMI's goal was to continue operating as a debtor-in-possession ("DIP").

Due to GPMI's severe cash flow issues, the bankruptcy court approved GPMI's DIP motion to obtain emergency post-petition financing from a third-party lender who had granted previous loans to GPMI.[6] The bankruptcy court also approved GPMI's request to retain MCA to allow MCA to continue pursuing investors and/or purchasers.

The bankruptcy court appointed an official unsecured creditors' committee, comprised of five trade creditors and material suppliers with

---

[5] Albaad subsequently liquidated and sold its North America wipes manufacturing business to Guy & O'Neill. Guy & O'Neill was also one of GPMI's prospective buyers and signed a Non-Disclosure Agreement.

[6] The bankruptcy court authorized DIP financing up to $2.5 million from an accounts receivable factoring credit facility, up to $2 million from an inventory credit facility, and up to $500,000, secured by liens on GPMI's real and personal property. In March 2022, GPMI obtained replacement DIP financing.

total claims exceeding $2 million ("Committee"). The Committee was described as "terrifically sophisticated" with "people in the industry that are actually working in this industry every day," who "know what businesses are worth, what equipment is worth." The Committee hired a financial advisor with extensive experience and knowledge in the field of complex business reorganization.

The Committee actively participated in marketing GPMI. The Committee reported that, as of April 26, 2022, GPMI was "left with no active interested parties, and GPMI's prospects for any reorganization or sale appeared very grim and liquidation of the estate appeared imminent."

Nonetheless, GPMI and MCA continued efforts to find investors and/or purchasers. Several months later, the Committee was asked to review a possible acquisition of GPMI by Envoy Solutions, LLC ("Envoy") for a purchase price of $4.3 million. The Committee approved of the proposed purchase by Envoy. The Committee had "absolute confidence in the marketing process," and believed "that the marketing efforts were thorough and persistent in the face of a difficult market, and that the Envoy proposal represented the best potential for recovery to allowed unsecured creditors."

D.    **The chapter 11 plan**

With the Committee's approval and after more than a year of marketing, GPMI reached an agreement to sell to Envoy pursuant to a plan of reorganization. GPMI filed a chapter 11 plan on October 14, 2022, a first

amended plan on October 24th, and a second amended plan ("Plan") on October 31st. The Plan was filed within the extended period of exclusivity provided by § 1121.[7]

Envoy proposed to fund the Plan by paying $4.3 million, in addition to its previous payment of $400,000 in the form of a DIP loan. In return, Envoy would receive 100 percent of the equity in the reorganized debtor.

In general, the Plan proposed a division of GPMI's assets into two separate entities: (1) a newly formed "Litigation Trust," tasked with prosecuting GPMI's causes of action—including claims against Albaad[8] and Michelin[9]—and distributing litigation proceeds to unsecured creditors;[10] and (2) the "Reorganized Debtor," which would retain

---

[7] The bankruptcy court approved GPMI's unopposed motions to extend exclusivity under § 1121(b) and § 1121(c)(3) to October 14, 2022 and then December 14, 2022.

[8] In October 2022, GPMI filed an adversary complaint against Albaad, (the "Albaad Lawsuit") asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, and promissory estoppel. The Complaint alleged damages in excess of $19 million. The action is pending.

[9] GPMI filed a Complaint against Michelin Lifestyle Ltd. and Michelin North America, Inc. (collectively "Michelin"), asserting claims that Michelin breached an agreement to jointly develop and market consumer products under the Michelin name. GPMI developed the product over the course of a year, began manufacturing, and entered into a contract with Walmart to sell the product, but within weeks of fulfilling Walmart's initial order, Michelin took actions to stop the manufacture and sale of the product. GPMI's Complaint sought over $2 million in damages. The Complaint was dismissed by the Arizona District Court for lack of jurisdiction. GPMI filed a second complaint against Michelin North America, Inc., in London. The action is pending.

[10] The Litigation Trust assumed all of Debtor's liability to creditors holding Allowed Claims and Allowed Administrative Expense Claims not otherwise satisfied by the Plan or assumed by Envoy.

ownership of all of GPMI's other assets and operate GPMI's business operations as a going concern.

### 1. The Litigation Trust

The Plan proposed that the newly formed Litigation Trust would initially be funded with $500,000 of Envoy's $4.3 million purchase payment. The money would allow the trustee of the Litigation Trust ("Trustee") to prosecute GPMI's causes of actions against Michelin and Albaad. Under the terms of the Litigation Trust, if the litigation was successful, the Trustee would distribute proceeds to the claimants holding allowed unsecured claims. Additionally, the Trustee would receive no compensation until the unsecured creditors received payments equal to at least 25% of their allowed claims. The Plan proposed that Bendor would serve as the initial Trustee.

All creditors except Albaad supported Bendor serving as the initial Trustee. Indeed, during negotiations, the Committee acknowledged that unless the Trustee was successful in prosecuting the claims, there would be no proceeds for payment on unsecured allowed claims. The Committee agreed that Bendor was the best choice to serve as Trustee because of his experience and knowledge. Notwithstanding the Committee's agreement, the Committee also wanted to ensure that the creditors would have some on-going voice. Therefore, the Committee insisted on a "Trust Oversight Committee" that would oversee and monitor the activities of the Trustee.

**2. The Reorganized Debtor.**

The Plan further proposed that the newly created Reorganized Debtor would continue GPMI's business operations as a manufacturer of packaged wet wipes for the cleaning and automotive industries. The Reorganized Debtor would be vested with GPMI's operating assets free and clear of all liens, claims, and encumbrances except the obligations explicitly assumed in the Plan. The Plan terminated all GPMI shareholder interests with respect to the Reorganized Debtor. However, the Plan indicated that Envoy would seek to retain Bendor as an employee of the Reorganized Debtor subject to a separately negotiated employment contract.[11]

**3. Classification of claims and voting**

The Plan initially provided for eight classes.[12] Relevant here is Class 6, which was solely comprised of all claims of Albaad, including the Albaad proof of claim filed with the bankruptcy court. GPMI disputed Albaad's proof of claim which listed the debt as $13,069,027.20. However, the court "temporarily allowed Albaad an unsecured claim of $3,800,000

---

[11] On November 18, 2022, GPMI filed the employment agreements outlining the terms of Bendor's employment with the Reorganized Debtor.

[12] As confirmed, the Plan provided for nine classifications of claims. The classes, as well as descriptions of their treatment, and resulting impairment, are set forth in the court's order confirming GPMI's Plan.

for voting purposes." Class 6 (Albaad)[13] was impaired and rejected by the Plan.[14]

## E.   First confirmation hearing

At the initial hearing on confirmation on November 18, 2022, the bankruptcy court approved GPMI's second amended disclosure statement, conditionally approved GPMI's settlement with creditor NFS Leasing, Inc. regarding the purchase of some of the leased equipment, overruled class 2C's objection to the Plan, and set an evidentiary hearing on Albaad's objections to the Plan.

Albaad's objections to the Plan included an allegation that the Plan violated § 1129(b)(2), the absolute priority rule, because (1) Bendor's employment was an impermissible benefit bestowed upon him based on his former equity interest; and (2) GPMI failed to hire a broker to sell the business and provide a professional valuation as required by the United States Supreme Court's holding in *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999). Albaad also argued that the Plan violated § 1129(a)(5) because Bendor's appointment as Trustee of the Litigation Trust was inconsistent with the interests of creditors and public policy.

---

[13] GPMI separated Albaad's claim from the class of other unsecured claims (Class 8) because Albaad's claims were disputed and were subject to counterclaims and affirmative defenses that were actively being addressed in the Albaad Litigation.
[14] Only one other class rejected the Plan; Class 2C – Eastern Shipping Worldwide.

**F.**     **Evidentiary Hearing**

    **1.**     **Alleged violations of § 1129(b) and the absolute priority rule.**

Albaad argued that the Plan violated the absolute priority rule based on Bendor's post-confirmation employment with the Reorganized Debtor. Specifically, Albaad asserted that because Bendor was a GPMI shareholder, his post-confirmation employment bestowed a benefit that triggered the open marketing testing required by *LaSalle*. Albaad argued that when old equity continues to have an interest and influence in the new equity, *LaSalle* required that GPMI adhere to specific marketing procedures. According to Albaad, "*203 North LaSalle* triggers, basically, a separate inquiry, was this actually a competitive process, or is this equity just handpicking what happens to the assets."

Albaad pointed to several alleged deficiencies in GPMI's marketing such as GPMI's failure to issue a valuation report, hire a broker, provide bidding procedures, or allow for competitive bidding. Despite declarations stating that there was no prior relationship between GPMI and Envoy, Albaad also posited that an undisclosed arrangement must have existed between GPMI and Envoy, otherwise, Albaad questioned, "how [did] Envoy become the cherry-picked buyer[?]"

GPMI disputed Albaad's allegations. GPMI argued that Albaad's assertions were both without merit and belied by the overwhelming evidence provided through the Plan confirmation process, such as the disclosure documents, declarations, and witness testimony. According to

GPMI, Albaad's meritless claims were simply an attempt to derail the confirmation process in an effort to forestall the continuation of GPMI's lawsuit against Albaad.

GPMI presented evidence that its marketing process was extensive and thorough and began before GPMI filed for chapter 11 relief. GPMI presented declarations from Bendor, MCA, and the Committee describing GPMI's thorough and persistent marketing efforts to find an investor or buyer for GPMI. Additionally, a representative of MCA specifically disputed Albaad's allegations that GPMI's failure to hire a separate broker demonstrated deficient marketing. Based on MCA's substantial chapter 11 experience, the representative testified that the job of marketing a debtor for sale had always been performed by an experienced financial advisor, and the representative was unaware "of any instance in which a broker had also been retained." Additionally, because the Plan did not preclude competitive bidding and allowed for the possibility of a topping bid, there was no need for a formal valuation of GPMI. A representative of the Committee also testified that the Committee was very involved, "knew what was going on," and had "absolute confidence in the marketing process."

GPMI also argued that Albaad had provided no evidence beyond unsupported supposition that GPMI chose Envoy as the buyer because of a personal benefit to Bendor or because Bendor somehow manipulated the

plan confirmation process to benefit himself. GPMI argued the evidence demonstrated the contrary for several reasons.

First, GPMI presented evidence[15] demonstrating that the Reorganized Debtor's decision to hire Bendor in a managerial role after Plan confirmation was based on Bendor's expertise, experience in the field, his years of successfully managing GPMI, and his intimate knowledge of GPMI's business and was not based on Bendor's manipulation of the process to benefit himself. Second, GPMI presented evidence demonstrating that Bendor's employment was not a condition of Envoy's agreement to purchase the equity interests in GPMI. Rather, Bendor's employment agreement was a completely separate negotiation that was not finalized until after the Plan was filed. Third, GPMI presented evidence that pursuant to the terms of the Plan and Bendor's proposed employment contract, Bendor would be hired by the Reorganized Debtor as an at-will employee who would have no interest, ownership interest, or stock options with regard to, or because of, his employment with the Reorganized Debtor.

### 2. Alleged violation of § 1129(a)(5)

At the hearing, Albaad also objected to the Plan on the grounds that the Plan violated § 1129(a)(5) because Bendor's role as the Trustee of the Litigation Trust was contrary to the best interest of the creditors. Albaad

---

[15] Evidence included declarations, live testimony, documents, and copies of relevant communications.

asserted that because Bendor would be a material witness in the Trust's litigation, Bendor's interest was adverse to Albaad, and thus Bendor could not be a neutral trustee as required by § 1129(a)(5).

The bankruptcy court acknowledged Bendor's potential conflict of interest but questioned Albaad's premise given no other creditors nor the U.S. Trustee had objected to Bendor's appointment.

GPMI disputed Albaad's claims, arguing that Bendor's appointment as Trustee was in the best interest of creditors and that GPMI and the Committee specifically selected Bendor only after careful consideration. Because the Litigation Trust's assets consisted primarily of claims against Albaad and Michelin, GPMI argued that Bendor was ideally suited to serve as Trustee in light of his personal experience, knowledge of GPMI, and knowledge of the factual basis of the litigation claims.

Additionally, GPMI presented evidence that Bendor's role would be subject to significant control by a "Trust Oversight Committee" with "very sophisticated participants." Pursuant to the terms of the Litigation Trust, the Trustee would have an ongoing obligation to keep the Oversight Committee informed of the continuing efforts on behalf of the Litigation Trust to collect, liquidate, and distribute any Trust assets.

## G. Confirmation order

At the close of the evidentiary hearing, the bankruptcy court confirmed the Plan with minor changes agreed to by the parties at the

14

hearing.[16] The bankruptcy court entered GPMI's proposed order approving the disclosure statement and confirming the Plan.

Albaad timely appealed. Albaad also filed an emergency motion for a stay pending appeal with both the bankruptcy court and the BAP. Both motions were denied.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(L). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Did the bankruptcy court abuse its discretion when it confirmed the Plan?

Did the bankruptcy court commit clear error when it found that the Plan did not violate the absolute priority rule?

Did the bankruptcy court commit clear error when it found that the Plan complied with the applicable requirements of § 1129(a)(5)?

## STANDARDS OF REVIEW

We review the bankruptcy court's decision to confirm a chapter 11 plan for an abuse of discretion. *Marshall v. Marshall* (*In re Marshall*), 721 F.3d 1032,1045 (9th Cir. 2013) (citation omitted). Abuse of discretion occurs when a court applies the wrong legal standard, misapplies the correct legal

---

[16] Albaad's only objection to the proposed form of the confirmation order was to paragraph 76, Reversal or Modification. Albaad was concerned the provision would be interpreted to moot any appeal. The bankruptcy court disagreed, finding that the clause would not adversely impact any appeal of Plan confirmation.

standard, or makes factual findings that are illogical, implausible, or without support in the record. *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc). Factual findings regarding whether a plan satisfies the confirmation requirements are reviewed for clear error. *See Comput. Task Grp., Inc. v. Brotby* (*In re Brotby*), 303 B.R. 177, 184 (9th Cir. BAP 2003). Clear error exists when the reviewing court has a definite and firm conviction that a mistake has been made. *Id.*

## DISCUSSION

Confirmation of a proposed chapter 11 reorganization plan is governed by § 1129.

### A. The Plan complies with § 1129(b)

#### 1. The absolute priority rule

If the plan is not consensual, meaning that if § 1129(a)(8) is not satisfied (and there is no unanimous acceptance of the plan by all the impaired classes), the plan may still be confirmed if the court finds that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(b)(1); *see also Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653-54. (9th Cir. 1997).

For a plan to be fair and equitable as to impaired unsecured claims, it must, at a minimum, comply with the absolute priority rule, which requires that a dissenting class of unsecured creditors is provided for in full

16

before any junior class (including old equity holders) receives or retains any property under the plan on account of their junior claim or interest. § 1129(b)(2)(B); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988). The rule was a response to "concern . . . [regarding] the ability of a few insiders, whether representatives of management or major creditors, to use the reorganization process to gain an unfair advantage." *LaSalle*, 526 U.S. at 444 (cleaned up).

Importantly, § 1129(b)(2)(B)(ii) only prohibits junior equity from receiving or retaining property "on account of" an interest that is junior to other unsecured creditor claims. Consequently, § 1129(b)(2)(B)(ii) is not implicated when old equity "receive[s] or retain[s]" property "under the plan [**not**] **on account of** [a] junior claim or interest." § 1129(b)(2)(B)(ii) (emphasis added); *see Bonner Mall P'ship v. U.S. Bancorp Mort. Co.* (*In re Bonner Mall P'ship*), 2 F.3d 899, 908-14 (9th Cir.1993), *dismissed on other grounds*, 513 U.S. 18 (1994).

### 2. New value corollary to the absolute priority rule

An exception or corollary to the absolute priority rule in § 1129(b)(2)(B)(ii) allows old equity to retain an interest in the reorganized debtor notwithstanding the objection of an unsecured class that is not paid in full, if they give "value" to the reorganized debtor that is: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received. *In re Bonner Mall P'ship*, 2 F.3d at 909. Under the "new value

17

exception" when old equity makes a new, substantial, necessary and fair infusion of capital it may retain its interest notwithstanding the absolute priority rule. *LaSalle*, 526 U.S. at 435, 442-43.

### 3. Albaad either misunderstands or misapplies the holding of *LaSalle*

Before the bankruptcy court, and again on appeal, Albaad asserts that the Plan violates the absolute priority rule because the Plan was proposed during the exclusivity period and Bendor used his position as an old equity holder to select a buyer and craft terms of the Plan that were personally beneficial to him. Albaad's argument relies heavily on its interpretation of the holding in *LaSalle*, i.e. that *LaSalle* required "market testing of [Envoy's] offer," but GPMI's "going-concern was not market-tested." Therefore, according to Albaad, the Plan violates the absolute priority rule.

Albaad either misunderstands or misapplies the holding of *LaSalle* and contrary to Albaad's assertions, the Plan does not violate the absolute priority rule.

First, unlike the facts in this case, the court in *LaSalle* was concerned about a plan that allowed old equity the exclusive opportunity to retain ownership in a reorganized debtor. In *LaSalle*, it was the "exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals," that rendered the opportunity "on account of" the old equity

18

position and therefore a violation of the absolute priority rule. *LaSalle,* 526 U.S. at 455-57.

The Supreme Court in *LaSalle* explained that there was no way for the bankruptcy court to "test the adequacy [and fairness] of an old equity holder's proposed contribution," and whether it satisfied the new value corollary, when the debtor could not provide the bankruptcy court with any information as to what "someone else would have paid." *LaSalle,* 526 U.S. at 453. This is because in *LaSalle* there was no market testing of the offer made in the plan of reorganization because the old equity holders were the only party given the exclusive right to invest in the reorganized debtor. *Id.* at 453-58.

In this case, the new value corollary is not applicable because Albaad offered no evidence that the Plan provided Bendor "exclusive opportunities free from competition" to acquire an interest in the Reorganized Debtor "on account of" his old equity position. Rather, under the Plan, all existing equity was cancelled without compensation.

Albaad's attempts to liken Bendor's post-confirmation employment to *LaSalle's* old equity holders' exclusive opportunity to obtain an equity interest in the Reorganized Debtor are without merit. Albaad provides no evidence that Bendor's post-confirmation employment with the Reorganized Debtor is an equity interest that Bendor is receiving under the Plan or that his employment is "on account of" his former equity ownership in GPMI. Rather, the record demonstrates that Bendor, along

with all other old equity lost all equity interest in GPMI upon the confirmation of the Plan. Additionally, the plain language of Bendor's employment agreement states that he is an at-will employee and that he will not receive any equity interest in the Reorganized Debtor.

Second, although GPMI proposed the Plan during the exclusivity period, there are no facts demonstrating that Bendor purposely used the exclusivity period to craft and propose a personally beneficial plan as happened in *LaSalle*. Similarly, there are no facts demonstrating that Bendor used the exclusivity period to game the system and propose a plan that was "too good a deal" for Bendor. *LaSalle*, 526 U.S. at 444. Albaad provided no evidence to support its argument that Envoy was a "cherry picked buyer."

To the contrary, the bankruptcy court found that GPMI and its principals (including Bendor) "had no preexisting relationship" with Envoy and the "Plan was negotiated as an arms-length transaction subject to the scrutiny of, among others, the Committee, the U.S. Trustee and the Court." Albaad has not met its appellate burden of demonstrating the findings are clear error.

Although Bendor's post-confirmation employment with the Reorganized Debtor is undoubtedly a benefit for Bendor, the evidence demonstrated that Envoy hired Bendor because of Bendor's experience and expertise, not because of his old equity interest in GPMI. Furthermore, the bankruptcy court found that the employment agreement was negotiated

20

independent of the terms of the Plan and that Envoy's agreement to purchase GPMI was not dependent on Bendor's employment with the Reorgainzed Debtor.

Third, contrary to Albaad's assertions, the holding in *LaSalle* did not require certain valuation or marketing methods of GPMI's going concern. *LaSalle* merely stated that "the best way to determine value [and test the adequacy of an old equity holder's proposed contribution] is exposure to a market." *LaSalle*, 526 U.S. at 457 (citations omitted). However, *LaSalle* specifically stated it was not deciding what a debtor must do to "market test" the interest[17] although it identified some alternatives, such as the right to bid for the same interest or the right to file a competing plan. *Id.* at 458.

Thus, even if *LaSalle* and the new value corollary applied, GPMI was not obligated to hire a broker to sell the business or provide a professional valuation as asserted by Albaad. Rather, GPMI's marketing efforts satisfied the market testing requirement.

A review of the record demonstrates that the bankruptcy court did not clearly err in finding that GPMI engaged in significant, active efforts to market GPMI to both investors and buyers. The evidence established that GPMI marketed its business for over a year, with the assistance of a respected business advisor targeting over 30 qualified parties, including

---

[17] The *LaSalle* Court noted that "[w]hether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity **is a question we do not decide here**." *LaSalle*, 526 U.S. at 458 (emphasis added).

Albaad. Negotiations progressed with several prospective buyers to the point of exchanging due diligence materials. However, with the exclusion of Envoy, all prospective financial buyers eventually declined to pursue an acquisition. Thus, unlike *LaSalle*, there was sufficient evidence for the bankruptcy court to find that the price paid by Envoy was the "greatest possible addition to the bankruptcy estate, . . . [and not] less than someone else would have paid." *Id.* at 453.

The bankruptcy court also did not err in rejecting Albaad's assertions that the alleged accelerated timeline for confirmation somehow evidenced a lack of marketing by GPMI. The bankruptcy court found that GPMI was in dire financial need and without the accelerated timeline, GPMI would not have been able to continue to make payroll or rent payments which would have resulted in liquidation rather than reorganization continuation as a going concern.

Based on the foregoing, the absolute priority rule is not implicated, and the bankruptcy court did not commit clear error in finding that the Plan complies with § 1129(b).

**B.    The Plan complies with § 1129(a)(5)**

A chapter 11 plan may not be confirmed if the continuation in management of the persons proposed to serve as officers or managers of debtor is not in the interests of creditors and public policy. § 1129(a)(5)(A)(ii). Continued service by prior management may be inconsistent with the interests of creditors and public policy if it directly or

indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor. *Linda Vista Cinemas, L.L.C. v. Bank of Ariz. (In re Linda Vista Cinemas, L.L.C.)*, 442 B.R. 724, 735-36 (Bankr. D. Ariz. 2010) (citing *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003)).

Albaad argues that the bankruptcy court erred in confirming the Plan because the Plan violates § 1129(a)(5) by allowing Bendor to serve as "post confirmation management of the Litigation Trust [which] is not consistent with the interest of creditors or public policy." Because Bendor is an interested party and a material witness in the potential litigation (asset of the Litigation Trust), Albaad asserts that he should not serve as Trustee because a "trustee should have some sense of independence to fairly manage the trust and disburse assets in a fair manner." Albaad further asserts that the Trust Oversight Committee is not sufficient protection because Bendor retains too much discretion and "has unbridled discretion to choose when to pay out a creditor's claim, if at all."

Albaad's assertions are without merit. Although Albaad is correct in its assessment that Bendor is not disinterested, Albaad has not demonstrated that this causes Bendor's appointment as Trustee to be inconsistent with the interest of creditors or public policy in violation of § 1129(a)(5).

First, Albaad's assertions that because Bendor has an interest adverse to Albaad in the Albaad Litigation, he would not treat Albaad fairly and

would "essentially ensure that Albaad will never receive a pay-out even if its claims are successful" are mere supposition and belied by the plain language of the terms of the Litigation Trust. According to the terms of the Litigation Trust, Bendor must distribute proceeds from the Litigation Trust to creditors with allowed claims in accordance with the priorities of § 507 and the classification of claims set forth in the Plan. Thus, Bendor has the duty to distribute litigation proceeds on a pro rata basis pursuant to applicable law and the priority of the claims.

Second, Bendor's compensation as Trustee does not cause his appointment as Trustee to be contrary to the interest of creditors or public policy as argued by Albaad. The bankruptcy court found that the terms of the Litigation Trust were "negotiated at arms-length" between GPMI and the Committee and that the Committee was very involved in the process of drafting the terms of the Litigation Trust. Although Bendor will receive compensation for serving as Trustee, he does not receive compensation until creditors receive at least 25% of their allowable claims. After that, Bendor's compensation increases as a percentage of the amount paid to creditors. Thus, Bendor's interest aligns with the unsecured creditors. Bendor receives more compensation only if the unsecured creditors receive more on their allowed claims.

Finally, Bendor's appointment as Trustee is not contrary to the interest of creditors as is evidenced by the wide support of other unsecured creditors who, through the Committee, had substantial input in the final

version of the Litigation Trust. Indeed, all impaired, unsecured creditors except Albaad supported the Plan and Bendor's appointment as Trustee. A Committee member testified that the terms of the Litigation Trust as presented in the Plan were "decidedly different" than in the first proposal because of the Committee's edits. "There was a complete redline and rewrite that was undertaken." The Committee reviewed various provisions that they had concerns about, "making sure that there was an oversight board that actually controls," not simply consults.

Based on the record, the bankruptcy court did not clearly err in finding that the terms of the Litigation Trust "including, but not limited to, the management and compensation provisions contained therein are in the best interests of all stakeholders and reasonable and appropriate under the circumstances" and that the Plan complied with § 1129(a)(5).

## C. Equitable Mootness

Equitable mootness is "a judge-made abstention doctrine unrelated to the constitutional prohibition against hearing moot appeals." *Rev Op Grp. v. ML Manager LLC* (*In re Mortgs. Ltd.*), 771 F.3d 1211, 1214 (9th Cir. 2014). The doctrine holds that even where effective relief is theoretically possible, and the appeal is therefore not constitutionally moot, courts may "dismiss appeals of bankruptcy matters when there has been a 'comprehensive change of circumstances . . . so as to render it inequitable for [the] court to consider the merits of the appeal.'" *Id.* (quoting *Motor Vehicle Cas. Co. v. Thorpe Insulation Co.* (*In re Thorpe Insulation Co.*), 677 F.3d, 869, 880 (9th Cir.

2012). The "party moving for dismissal on mootness grounds bears a heavy burden." *In re Thorpe Insulation Co.*, 677 F.3d at 880 (citation omitted). Substantial consummation does not, by itself, render an appeal moot. *In re Mortgs. Ltd.*, 771 F.3d at 629.

Appellees argue that this appeal is equitably moot. The Panel has judicial discretion to determine the merits of this case despite claims of equitable mootness. Because we are ruling on the merits, the Panel need not render a ruling on the appellee's claim of equitable mootness. *See e.g. Co Petro Mktg. Grp., Inc., v. Commodity Futures Trading Comm'n* (*In re Co Petro Mktg. Grp., Inc.*), 680 F.2d 566, 569 n.1 (9th Cir. 1982).

## CONCLUSION

Because the bankruptcy court did not clearly err in finding that the Plan satisfied the confirmation requirements, the bankruptcy court did not abuse its discretion in confirming the Plan. We AFFIRM.